### G.D. SEARLE & CO,

v.

### HUDSON PHARMACEUTICAL CORPORATION,

**G.D. Searle & Co., Appellant, in No. 82–5600.**

**Hudson Pharmaceutical Corp., Appellant in No. 82–5621.**

Nos. 82–5600, 82–5621.

United States Court of Appeals, Third Circuit.

Argued June 6, 1983.
Decided Aug. 29, 1983.

Stuart J. Sinder (argued), Kenyon & Kenyon, New York City, Stuart J. Freedman, Cadence Industries Corp., West Caldwell, N.J., for appellant.

William J. Heller (argued), Stryker, Tams & Dill, Newark, N.J., for appellee.

Before SEITZ, Chief Judge, SLOVITER, Circuit Judge, and POLLAK, District Judge *.

**OPINION OF THE COURT**

LOUIS H. POLLAK, District Judge.

**I.**

Plaintiff Searle and defendant Hudson are pharmaceutical firms. This controversy, arising under pertinent provisions of the Lanham Act,[1] centers on a vegetable laxative—psyllium hydrophilic mucilloid—produced by both firms. Since 1934 Searle has marketed psyllium hydrophilic mucilloid under the registered trademark METAMUCIL; a highly profitable product, METAMUCIL has been responsible for $275,000,000 in sales since 1970. Hudson began marketing psyllium hydrophilic mucilloid in 1964. Its first proposed trade name was REGUCIL, but when Searle opposed registration of that name, agreement was reached on REGACILIUM, the registered trademark under which Hudson has sought to compete with Searle's METAMUCIL ever since.

With REGACILIUM (as with a number of other products which Hudson and other pharmaceutical firms sell under different trade names), Hudson has sought to acquire a strong share of the market by aggressive price competition bolstered by an advertising strategy which identifies the competitive brand and stresses Hudson's price advantage. Comparative advertising of this kind has been pursued by Hudson for many years not only in trade catalogues but also in so-called "point of purchase" advertising which undertakes to bring product names and their respective prices to the consumer's attention at the retail display counter.[2] Since 1972 Hudson has frequently included in its comparative advertising the recital that REGACILIUM is "Equivalent to METAMUCIL."[3]

Until 1980, REGACILIUM and METAMUCIL were packaged in quite dissimilar ways. Each product was in a white plastic container, but the containers were entirely unlike:

The standard fourteen-ounce container of natural-flavored[4] REGACILIUM had the configuration of a conventional jelly-jar or pickle-jar, rounding at the shoulders to a

---

\* Hon. Louis H. Pollak, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

1. 15 U.S.C. §§ 1114(1), 1125. A pendent claim of New Jersey common law unfair competition was treated by the court below as tracking the Section 1125 aspect of Searle's federal claim.

2. The court below found that similar comparative advertising techniques have been employed by other pharmaceutical firms promoting products competitive with METAMUCIL and also by Searle on METAMUCIL's behalf.

3. When Searle, in the mid-seventies, objected to Hudson's unadorned references to METAMUCIL, Hudson consented to identify METAMUCIL as Searle's trademarked product.

4. As distinct from orange-flavored.

yellow screw-top. Swathing the torso of the container was a blue-and-yellow-and-white label which, in black print, presented "REGACILIUM® Brand of Psyllium Hydrophilic Mucilloid."

The standard fourteen-ounce container of natural-flavored METAMUCIL was a cylinder with a white screw-top. Eschewing labels, Searle proclaimed the virtues of its "natural-fiber laxative" in print on the container itself. Most of the printing was green against the white background of the container. But the principal legend—"METAMUCIL® Brand of Psyllium Hydrophilic Mucilloid"—was white against green.

In November of 1980, the fourteen-ounce natural-flavored REGACILIUM graduated from its round shoulders, its yellow screw-top and its multi-colored label. It burst forth on America's laxative display counters as a cylinder with a white screw-top. The new container was unlabelled; Hudson's message was printed directly on the container. Most of the message was printed in green on the white plastic background. The single exception was a white-on-green legend which for the first time set forth in the text carried by a REGACILIUM container the recital Hudson had long included in trade catalogues and "point of purchase" advertising: "Equivalent to METAMUCIL."

The appearance of the newly-clad REGACILIUM precipitated this litigation. Searle sued Hudson in the District Court for the District of New Jersey to enjoin any mention of METAMUCIL on the REGACILIUM container. On May 29, 1981, Judge Meanor issued a temporary restraining order precluding further reference to METAMUCIL on the REGACILIUM container

unless the defendant's container is changed such that "METAMUCIL" appears in type no larger than the word "Equivalent" and in green letters on the white background. Defendant shall place an ® next to the METAMUCIL mark and shall state adjacent to said mark the

statement "a product of G.D. Searle, not a Hudson product."

Joint Appendix ("J.A.") at 111.

The temporary restraining order was continued in force pending disposition of Searle's application for a permanent injunction. On March 26, 1982, on the basis of a record substantially augmented by depositions, affidavits and exhibits, Judge Meanor filed a thoughtful opinion concluding that a permanent injunction should issue.

Referring to the REGACILIUM container as it appeared in November of 1980 (and without the modifications required by the 1981 temporary restraining order), the district court rejected Hudson's contention that there was no basis for a finding of likelihood of confusion (footnotes omitted):

In sum, the similarity in the packaging of the products, the distinctive eye-catching display of the METAMUCIL mark in white letters contrasted against the only shaded portion of the container, the absence of any reference to Searle's ownership rights in its trademark, and the overall presentation of the new REGACILIUM container point to the inevitable conclusion that there is in fact and in law a substantial likelihood that consumers will be confused and will purchase REGACILIUM thinking that they are buying a cheaper version of the product manufactured by the same company that manufactures METAMUCIL.

Furthermore, based on the evidence presented subsequent to the hearing in connection with the temporary restraining order, I find that Hudson intended to create consumer confusion in designing and marketing the new container. The statements of Mr. Sinclair [Hudson's Assistant Product Manager] concerning his understanding of the purpose of the repackaging, the handwritten comments contained on the initial launch proposals which revealed Hudson's design to "knock off" the METAMUCIL product, and the manner in which the new REGACILIUM container was designed lead this court to conclude that Hudson intended to promote the sale of REGACILIUM by encouraging the public to identify the

source of its product with METAMUCIL and to thereby capitalize on the good will embodied in the METAMUCIL mark.

J.A. at 470–71.[5]

The district court also rejected Searle's contention that, going beyond the relief embodied in the temporary restraining order, Judge Meanor should direct Hudson to make no mention of METAMUCIL whatsoever on the REGACILIUM container. The court was unpersuaded that references to METAMUCIL permitted in Hudson's trade catalogues or "point of purchase" advertising were, as a matter of law, impermissible when placed on the container of Hudson's competitive product. Further, the court found unconvincing the testimony adduced by Searle of one instance of a consumer who, looking for METAMUCIL, purchased

REGACILIUM in a container conforming to the modifications required by the temporary restraining order.[6]

Finally, the district court saw no merit in the proposition that Hudson's past "abuse of the Metamucil mark"—an apparent reference to the bad intent of Mr. Sinclair and Hudson's other marketing officials—should disable Hudson from an otherwise permissible reference to METAMUCIL on the REGACILIUM container:

> Plaintiff is only entitled to that protection which the trademark laws confer. I have found that the modified REGACILIUM label avoids the possibility that plaintiff's rights in its registered mark will be diluted. I decline to augment the injunction with additional restraints that may serve to undermine competition.

5. With respect to Hudson's intent, the district court added the following footnote (J.A. at 470):

> Defendant's intent is not an element of a trademark infringement action. *Johnson & Johnson v. Quality Pure Manufacturing, Inc.*, 484 F.Supp. 975 (D.N.J.1979). Where intent to cause consumer confusion is demonstrated, however, a number of courts have held that a presumption of likelihood of confusion arises. *See, e.g., Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.*, 511 F.Supp. 486 (S.D.N.Y.1981). Due to this court's prior conclusion that the new REGACILIUM container in fact has the tendency to mislead consumers, there is no need to indulge in this presumption.

> Judge Meanor also noted, with respect to the testimony that Hudson's marketers planned to "knock off" the METAMUCIL container, that the parties were in agreement "that 'knock off' is generally understood in the trade to mean copy or duplicate."

6. The court below described and analyzed the testimony in the following terms (J.A. at 473–74):

> The circumstances surrounding this purchase . . . are revealing. Mrs. Luedtke did not go to the store to buy a laxative. She was confronted at the entrance to the store by a man employed by Searle who informed her that he was taking a survey and that she could earn $3.00 toward the purchase of METAMUCIL if she would go inside, purchase the product, and show him the fruits of her endeavor. Mrs. Luedtke initially testified that she purchased the product because "she thought she saw METAMUCIL in [the label]," Luedtke Dep. at 14, but later said that she couldn't be sure she saw the word at that

time and may have only seen it outside of the store when the survey man brought it to her attention. *Id.* at 52. She stated unequivocally that when her attention was directed to the equivalency statement on the modified label she understood that it was a different brand of laxative that was being offered at a cheaper price. *Id.* at 41. She also noted that she was primarily influenced by the white container with the green label because her son had used METAMUCIL and it was the only container of this type in the household. It was clear from her testimony that she was concerned more with the price of the products displayed rather than with the quality of the laxatives.

> I find that Mrs. Luedtke was not acting as a reasonably prudent consumer of the type of goods in issue when purchasing the product under the aforementioned circumstances. I stated previously that purchasers of medicinal preparations such as the laxative products in issue would ordinarily be expected to exercise a greater degree of care than consumers of other retail products. The trademark laws are designed to prevent consumers from being misled but "the particular class of consumers to which the product is sold must be credited with at least a minimum capacity for discrimination." *International Election Systems Corp. v. Shoup*, 452 F.Supp. 684, 711 (E.D.Pa.1978). I decline to consider this isolated instance of a mistaken purchase pursuant to a survey sufficient to raise an inference of a likelihood that reasonable consumers of laxative products will be confused by the modified label. In fact, I find it inconceivable that someone who looks closely enough to see the equivalency statement will not also recognize the disclaimer and

J.A. at 474.[7]

## II.

Both Searle and Hudson have appealed from the permanent injunction.

Hudson contends, in essence, that the record does not permit a finding that the newly cylindrical November 1980 REGACILIUM container, complete with its white-on-green legend "Equivalent to METAMUCIL," created a likelihood of confusion. Bearing in mind the manifest similarity of the containers and that the similarity was achieved pursuant to Hudson's marketers' express desire to "knock off [i.e., copy[8]] the container utilized by the national equivalent METAMUCIL," we find that Hudson's arguments are fully met by Judge Meanor's careful opinion.

Searle contends on appeal, as it did below, that it was entitled to a decree foreclosing Hudson from making any reference to METAMUCIL on the REGACILIUM container. Searle concedes that the Lanham Act is not an impediment to Hudson's truthful references to METAMUCIL in its trade catalogues and "point of purchase" advertising. The concession is proper: 15 U.S.C. § 1114(1)(a) proscribes only such uses of another's trademark "in connection with the ... advertising of any goods or services" as are "likely to cause confusion, or to cause mistake or to deceive." And, as Judge Van Dusen has put it, speaking for the Ninth Circuit, "The use of a competitor's trademark for purposes of comparative advertising is not trademark infringement 'so long as it does not contain misrepresentations or create a reasonable likelihood that purchasers will be confused as to the source, identity, or sponsorship of the advertiser's product.'" *SSP Agricultural, Etc. v. Orchard-Rite Ltd.*, 592 F.2d 1096, 1103 (9th Cir.1979) (*quoting Smith v. Chanel, Inc.*, 402 F.2d 562, 563 (9th Cir.1968)).[9] But Searle contends that including a reference to a competitor's trademark in a text imprinted on the very package which brings one's product to the consumer is a qualitatively different form of communication—and different in a way which violates the Lanham Act.

The language of the Act offers no support for Searle's contention that the law of trademarks distinguishes in this fashion between packages and advertisements. 15 U.S.C. § 1114(1)(b) imposes a comprehensive prohibition on copying another's trademark and applying "such ... copy ... to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce;" but, as with 15 U.S.C. § 1114(1)(a), the statutory prohibition applies only where "such use is likely to cause confusion, or to cause mistake, or to deceive." Moving from the statute to the case law, it appears that no court has heretofore expressly addressed the distinction contended for.[10] But the distinction has been addressed by necessary implication in *Societe Comptoir de L'Industrie v. Alexander's Department Stores, Inc.*, 299 F.2d 33

---

therefore become informed of the source of origin of the product.

7. On August 27, 1983, the court below filed a supplementary Memorandum and accompanying Order which slightly revised the text of the METAMUCIL reference in order to make clear to REGACILIUM purchasers not only that METAMUCIL is a Searle product but also that REGACILIUM is not. The revised text was as follows:

METAMUCIL® is made by G.D. Searle & Co. Searle does not make or license REGACILIUM®.
J.A. at 477.

8. See *supra* note 5.

9. "[C]ollateral and truthful references to the trademark of another are permissible as long as the 'unauthorized' reference does not cause confusion as to the source of the product advertised. Delaware and *Hudson Canal Co. v. Clark*, 80 U.S. (13 Wall) 311, 327, 20 L.Ed. 581 (1872). 'Equity will not enjoin against telling the truth.' *Id.*" *Herbert Products, Inc. v. S & H Industries, Inc.*, 200 U.S.P.Q. 247, 250 (E.D. N.Y.1977).

10. Certain language in *Saxlehner v. Wagner*, 216 U.S. 375, 380, 30 S.Ct. 298, 54 L.Ed. 525 (1910) supports a reading of that case as one in which plaintiff was held not entitled to prevent defendant's use of her registered trademark on defendant's bottles; but it appears from *Saxlehner v. Eisner & Mendelson*, 179 U.S. 19, 21 S.Ct. 7, 45 L.Ed. 60 (1901), that the mark in question was one which had long since lost its vitality as a registered mark due to laches.

(2d Cir.1962), a decision of the Second Circuit which we find particularly instructive. Plaintiffs were firms authorized to market garments under the registered trademarks "Dior" and "Christian Dior." Defendant Alexander's, a New York department store, was selling garments which it advertised as copies of the Dior originals marketed by plaintiffs. Two district judges denied applications for preliminary injunctions.. On appeal, the Second Circuit described the modes of advertising employed by Alexander's (*id.* at 35):

> Defendant's representation that the garments being sold by it were copies of plaintiffs' original creations was apparently truthful. We do not understand plaintiffs to claim that the garments were so poorly made or executed as not to constitute copies; but in any event they have certainly failed to establish that to be the case. The merchandise was so described in newspaper advertisements, on hang tags attached to the garments reading, "Original by Christian Dior—Alexander's Exclusive—Paris—Adaptation"; and on a television fashion show sponsored by defendant which employed a singing commercial.[11]

In affirming, the court articulated the controlling legal principles—applicable to all three modes of advertising, including "hang tags" affixed to the garments themselves—in the following terms (*id.* at 36):

> In any proceeding under the Lanham Act the gist of the proceeding is a "false description or representation," 15 U.S.C.

§ 1125(a), or a use of the mark which "is likely to cause confusion or mistake or to deceive purchasers as to the source of origin of such goods or services," 15 U.S.C. § 1114(1). The registering of a proper noun as a trade-mark does not withdraw it from the language, nor reduce it to the exclusive possession of the registrant which may be jealously guard[ed] against any and all use by others. Registration bestows upon the owner of the mark the limited right to protect his good will from possible harm by those uses of another as may engender a belief in the mind of the public that the product identified by the infringing mark is made or sponsored by the owner of the mark. *Champion Spark Plug Co. v. Sanders*, 331 U.S. 125, 67 S.Ct. 1136, 91 L.Ed. 1386 (1947) citing with approval, *Prestonettes, Inc. v. Coty*, 264 U.S. 359, 44 S.Ct. 350, 68 L.Ed. 731 (1924). The Lanham Act does not prohibit a commercial rival's truthfully denominating his goods a copy of a design in the public domain, though he uses the *name* of the designer to do so. Indeed it is difficult to see any other means that might be employed to inform the consuming public of the true origin of the design.

As it was proper for Alexander's, on its hang tag, truthfully to identify the attached garment as an "Adaptation" of an "Original by Christian Dior," so it is proper for Hudson, on its REGACILIUM container, truthfully to characterize REGACILIUM as "Equivalent to METAMUCIL®." [12]

---

11. In a footnote, the court provided the lyrics for Alexander's singing commercial:

Dior, Dior, Christian Dior, the latest, latest, Chic-est, sleekest clothing you've been waiting for. That's Christian Dior,—Dior, Dior, Christian Dior, for coats with an elegant swirl, Dior, Dior, Christian Dior, whose dresses make you look like a girl. Suits fit floppier, they flatter any form, even if you're just above or just below the norm. Dior, Dior, Christian Dior, the latest, latest, Chic-est, sleekest clothing you've been waiting for. That's Christian Dior.

*Id.* at 35 n. 1.

12. Provided of course that Hudson added the caveat mandated by the court below. See *supra* note 7. Searle argues that it should suffice

for Hudson to explain to potential consumers that the product within the container is "psyllium hydrophilic mucilloid." But Hudson is entitled to conclude that such an explanation, while it may suffice for some consumers, would not convey enough information for those consumers whose identification of the laxative they trust is geared not to its ingredients but rather to the popular designation METAMUCIL. In the same way, Alexander's could reasonably conclude that a hang tag would communicate inefficiently if it limited its characterization of the design of the attached garment to a description of design components and made no mention of "Dior," the word which to most consumers best conveyed the design's essence. The Lanham Act does not compel a competitor to resort to second-best communication.

In short, whether one is entitled to refer to a competitor's trademark depends not on where the reference appears but on whether the reference is truthful. The governing principle, announced by Justice Holmes almost six decades ago, is clear:

> Then what new rights does the trademark confer? It does not confer a right to prohibit the use of the word or words. It is not a copyright.... A trademark only gives the right to prohibit the use of it so far as to protect the owner's good will against the sale of another's product as his.... When the mark is used in a way that does not deceive the public, we see no such sanctity in the word as to prevent its being used to tell the truth. It is not taboo.[13]

We have considered Searle's other contentions and found them insubstantial.[14] Accordingly, the permanent injunction entered below is affirmed.[15]

---

13. *Prestonettes, Inc. v. Coty,* 264 U.S. 359, 368, 44 S.Ct. 350, 351, 68 L.Ed. 731 (1924). *See Champion Plug Co. v. Sanders,* 331 U.S. 125, 129, 67 S.Ct. 1136, 1138, 91 L.Ed. 1386 (1947). *Cf. Saxlehner v. Wagner,* 216 U.S. 375, 30 S.Ct. 298, 54 L.Ed.2d 525 (1910).

14. (1) Although the court below, in concluding that Hudson's November 1980 REGACILIUM container was likely to generate consumer confusion, found that Hudson's adoption of the new container was "intended to promote the sale of REGACILIUM by encouraging the public to identify the source of its product with METAMUCIL and to thereby capitalize on the good will embodied in the METAMUCIL mark," the court's decree was designed to obviate further confusion. Under these circumstances, we do not think defendant's intent to confuse called for the entry of a more drastic decree precluding any reference to METAMUCIL on the REGACILIUM container. Judge Meanor could reasonably determine that there was "no justification for injunctive relief beyond that necessary to protect plaintiff against

confusion as to the product's source and dilution." *Polyglycoat Corp. v. Environmental Chemicals, Inc.,* 509 F.Supp. 36, 40 (S.D.N.Y. 1980).

(2) With respect to Searle's insistence that the testimony of consumer Luedtke compelled a finding that the likelihood of confusion was not cured by the requirements imposed on Hudson by the temporary restraining order, we think the district court's assessment of Mrs. Luedtke's testimony fully covers the ground. See *supra* note 6.

15. In June of 1981, each of the parties undertook to appeal from the temporary restraining order entered on May 29, 1981. Nos. 81–2235, 2236. Consideration of those appeals remained in abeyance pending consideration of the appeals from the permanent injunction. In view of our disposition of the appeals from the permanent injunction, we dismiss the appeals from the temporary restraining order as moot without determining whether appeals could properly lie from that order.